IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SALVATORE GAMBONE, et al. | : | CIVIL ACTION |
| | : | |
| vs. | : | |
| | : | |
| ADVANCED CONSTRUCTION MATERIAL CORP., JOSEPH LUONGO, et al. | : : : | NO. 01-1071 |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                                                 **NOVEMBER 9, 2005**

Based on the evidence produced at the hearing held on October 31, 2005, and the documents submitted by Plaintiffs the Court makes the following findings of fact.

1. On September 27, 2001, this Court entered Final Judgment in favor of Plaintiffs for a total of $170,000, plus attorneys' fees and costs, against defendants Advanced Construction Materials Corp. ("ACMC") and Joseph Luongo ("Luongo"), in an action for fraud and violation of federal and state securities laws. Certification of Counsel, dated September 16, 2005 ("Counsel Cert"), Exhibit E.

2. Through post-judgment discovery, Plaintiffs have learned that Luongo and ACMC have engaged in a pattern of transferring ACMC's assets for no value in order to avoid the judgment and thwart creditors in this case. See Counsel Cert., Exhibit N.

3. In 1997, ACMC was incorporated in the State of Nevada, with Joseph Luongo ("Luongo") named as ACMC's President. See Counsel Cert., Exhibit A, Pennsylvania Securities Commission Summary Order to Cease and Desist, ¶ 1 & 2. ACMC was purportedly in the

business of developing a manufacturing process for lightweight drywall.  From February through July 1998, Luongo sold unregistered shares of common stock of ACMC in violation of federal and Pennsylvania securities laws. Id. ¶ 3.  The Pennsylvania Securities Commission issued a Summary Cease and Desist Order on October 1, 1998 (the "Order"), ordering Luongo and ACMC to make no further offers or sales of ACMC stock.  See Counsel Cert., Exhibit A.  As set forth in the Order, the Pennsylvania Securities Commission found that Luongo had sold unregistered shares in violation of state securities laws and was also using the proceeds of the sale for his personal benefit. Id.

       4.  On or about December 24, 1998, Luongo caused Articles of Incorporation for Lite-Rock Drywall Corp. ("Lite-Rock") to be filed with the Secretary of State for the State of Nevada.  See Counsel Cert., Exhibit B.  Following the incorporation of Lite-Rock, Luongo began selling unregistered securities in Lite-Rock, representing to investors that ACMC was the holder of United States Patents on light-weight drywall.  See Counsel Cert., Exhibit C, page 3.

       5.  Between 1998 and 2001, more than $3,200,000 was invested by two hundred shareholders, located in at least a dozen states, in both ACMC and Lite-Rock.  Plaintiffs, all Pennsylvania residents, were among the parties induced to invest in Lite-Rock by Luongo.  See Plaintiffs' Complaint, filed March 25, 2001.

       6.  In a shareholder action against Luongo and ACMC pending in Nevada State Court entitled E.D.K. Resources, L.P., et al. v. ACMC, Case No. CV-02-02097, Second Judicial Court, Washoe County (the "Nevada Action"), ACMC has stated that it has no books and records, no bank accounts and financial records, and no offices.  See Counsel Cert., Exhibit D, Interrogatory No. 11.

7. In March 2001, Plaintiffs commenced this action. Luongo and ACMC failed to answer the Complaint and judgment was entered against them in September 2001. See Counsel Cert., Exhibit E.

8. On January 9, 2002, Luongo was indicted in the United States District Court, Eastern District of Virginia, for committing perjury before a federal grand jury. On February 13, 2002, Luongo pled guilty to one count of perjury in the matter of the <u>United States v. Joseph Luongo</u>, Criminal Action No. 02-7-A (E.D. Va.). Luongo was sentenced on May 24, 2002. See Counsel Cert., Exhibit H, Memorandum Opinion of United States District Judge James C. Cacheris, dated August 6, 2003 ("Cacheris Opinion"), p. 1.

9. On the eve of his sentencing, Luongo sent a letter to ACMC shareholders, dated April 8, 2002, falsely representing that ACMC had been "acquired" and all of its assets sold to an unidentified third-party. See Counsel Cert., Exhibit F. The April 8th letter announced that the assets and corporate office of ACMC were moved outside the United States to an undisclosed location. <u>Id</u>.

10. On May 24, 2002, Luongo was sentenced to serve two months in a federal prison for his perjury conviction. See Counsel Cert., Exhibit H, Cacheris Opinion, p. 1. On the eve of the commencement of his sentence, Luongo sent out a letter to shareholders on ACMC letterhead, dated June 18, 2002. See Counsel Cert., Exhibit G. The June 18th letter sated that the previously announced sale of ACMC would be completed within 90 days, which would cover the length of Luongo's incarceration. <u>Id</u>.

11. Following his release from prison in August 2002, Luongo was subject to specific parole terms, which included the following provisions: (1) home detention with electronic

monitoring for four months as directed by the Probation Office; (2) Luongo shall not open a new business venture or incur any debt in excess of $1,000, without approval of the Probation Office; (3) Luongo shall provide the Probation Office with access to any and all financial information related to Luongo or any business in which he is engaged; and (4) Luongo must make an effort to settle all law judgments against him in any Court within the United States.  See Counsel Cert., Exhibit H, Cacheris Opinion, p. 1-2.

    12. By letter dated May 18, 2003, Luongo caused a letter to be sent out on ACMC letterhead.  See Counsel Cert., Exhibit I.  In the letter, Luongo announced that the "ACMC Board of Directors has approved and begun to return the consideration paid by ACMC shareholders (excluding those involved in litigation with ACMC) for their ACMC shares."  Luongo does not disclose the source of the funds.  Luongo simply advised that ACMC shareholders will be contacted in "three weeks" by an unidentified escrow agent.  There were no funds, there was no "escrow agent".  Id.

    13. Following his release from prison, Luongo employed the same scheme used to defraud investors of ACMC and Lite-Rock with a new entity.  Luongo formed a new entity called United States Building Products ("USBP").  See Counsel Cert., Exhibit J.  From late 2002 to early 2003, new investors invested more than $900,000 into USBP.  See Counsel Cert., Exhibit K.  The investors understood that their funds had been invested in USBP and would be placed into a USBP account.  Since there was no executed License Agreement between USBP and ACMC, the funds invested into USBP should not have been transferred to ACMC.  Nonetheless, approximately $460,000 was transferred from the USBP account to ACMC's account for fees for licensing certain United States Patents.  See id.

14. During the hearing on Plaintiffs' Motion for Preliminary Injunction, James Nicholls testified that, in 2003, he was a director of both USBP and Innovative Technologies Enterprises Corp. (IT"). Nicholls testified further that he was not aware of any licensing agreement between ACMC and USBP. Notwithstanding that there was no licensing agreement, Nicholls testified that funds had been wrongfully transferred from USBP's account to ACMC for "licensing fees". N.T. 13-14.

15. Upon discovery of the misappropriation of these funds, the investors immediately withdrew the remainder of their investment in the USBP account. See Counsel Cert., Exhibit K, Affidavit of David Anthony, ¶¶ 4 & 5.

16. On June 24, 2003, ACMC and Lite-Rock shareholders, in the Nevada Action, filed a motion with the Nevada State Court to restrain the transfer of any assets of ACMC. See Counsel Cert., Exhibit "L", p.1. At a hearing on July 10, 2003, the Nevada State Court issued an Order restraining ACMC from transferring any assets and ordering Luongo to produce a sworn affidavit stating the current status of all ACMC assets and to identify any transfers of ACMC assets. See id., p. 2-3. Unbeknownst to Plaintiffs, eleven days later on July 21st, ACMC transferred the following patents to Innovative Technologies Enterprises Corporation, LLC ("IT"); US Patent No. 6,251,979; US Patent No. 6,319,312; US Patent No. 6,340,388; US Patent No. 6,391,958; and US Patent No. 6,403,688; US Patent Application No. 09/732,852; US Patent Application No. 09/828,994; International Patent Application No. PCT/US99/27267; Japanese Patent Application No. 2000-581875; Canadian Patent Application No. 2,349,248; Mexican Patent Application No. PA/a/2001/005039; Korean Patent Application No. 2001-7006266; European Patent Application No. 99960436.6; and Chinese Patent Application No. 99815719.8

(collectively, the "Patents"). See Counsel Cert., Exhibit M.

17. The transfer of the Patents was accomplished by the execution of an Assignment. See id. The Assignment was executed on behalf of ACMC on June 26, 2003 and on behalf of IT on July 21, 2003. See id. At the hearing, Mr. Nicholls confirmed that he executed the Assignment on behalf of IT at sometime between June 26, 2003 and July 21, 2003. N.T. 21 & 32-33.

18. At the hearing, Nicholls testified that IT is a British Virgin Island Company. Nicholls confirmed that he has been a Director of IT since its creation in 2003. At the time of the transfer of the Patents from ACMC to IT, Nicholls testified that Robert Hildreth served as a member of the board of directors of both ACMC, the transferor, and IT, thre transferee. See Also, Counsel Cert., Exhibit M, N.T. 6-7.

19. Nicholls further testified that ACMC transferred the Patents to IT and its owners, Nicholls and Hildreth, for no monetary consideration. Nicholls further testified that no monies have ever been paid by IT to ACMC for the Patents. The Patents were the sole assets of ACMC at the time of transfer to IT. See Counsel Cert., Exhibit D, Interrogatory No. 8. N.T. 28-29, 41.

20. ACMC was insolvent at the time it transferred the Patents to IT. See id.

21. In November 2003, Luongo submitted an affidavit in the Nevada Action, in which he stated that he was no longer an officer or director of ACMC, stated that he believed that the assets of ACMC were transferred to an unidentified "Mexican" corporation, for unidentified consideration. See Counsel Cert., Exhibit N. Luongo further testified that five United States

Patents issued to ACMC had been transferred to Innovative Technologies, LLC, a British Virgin Island corporation for no monetary consideration. See id.

22. At the time the Patents were transferred to IT, ACMC was still retaining control over the Patents, having taken approximately $460,000 in license fees from USBP, a substantial portion of these fees were then transferred to Luongo. See Counsel Cert., Exhibit K.

23. Following receipt of Luongo's Affidavit, plaintiffs in the Nevada action served interrogatories upon ACMC and Luongo. In responding to the Interrogatories, ACMC stated it could not locate its books and records (Interrogatory No. 11); it could not identify the "Mexican" company identified in Luongo's Affidavit (Interrogatory No. 15); it could not locate its corporate offices (Interrogatory No. 12); it could not identify the consideration received from IT for the transferred Patents (Interrogatory Nos. 4 & 9). By its own admission, ACMC had no records, no office, and received no consideration for the transfer of its assets. See Counsel Cert., Exhibit D.

24. On April 23, 2004, assignments of the Patents were filed with the United States Patent Office. These assignments were made in violation of the July 2003 Nevada Restraining Order, were made for no legal consideration, and were accomplished to avoid payment of Plaintiffs' judgment entered by this Court. The transfer of the Patents to IT, and its principals James Nicholls and Robert Hildreth, was a sham transaction and fraudulent transfer made in an attempt to defraud this Court's judgment.

## Conclusions of Law

1. This Court has jurisdiction over the parties and subject matter pursuant to 28 U.S.C. § 1331; Peacock v. Thomas, 516 U.S. 349; Epperson v. Entertainment Express, Inc., 242 F.3d 100, 105 (2d Cir. 2001).

2. Plaintiffs have established that they are likely to succeed on their claims.

3. I find that substantial and irreparable injury will result to Plaintiffs if the Preliminary Injunction is not granted, because the patents which are the subject of this litigation are the only assets of ACMC from which Plaintiff could possibly satisfy its judgment.

4. I find that greater injury will be inflicted upon Plaintiffs by the denial of the relief requested than will be inflicted upon the Defendants by granting the relief requested. If Plaintiffs are denied the injunctive relief they seek they would be deprived of the only possible asset from which they could satisfy the judgment. The effect of granting the Preliminary Injunction would not harm Innovative Technologies Enterprises Corp., LLC, James Nicholls and Robert Hildreth because it would merely preserve the status quo until a final decision could be made.

5. For the reasons set forth in paragraphs three and four above Plaintiff has no adequate remedy at law.

For the above reasons this Court granted the Preliminary Injunction requested by Plaintiffs on October 31, 2005.

BY THE COURT:

/s/ Robert F. Kelly
ROBERT F. KELLY
SENIOR JUDGE

9